Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: michael.esser@kirkland.com

Emily Nicklin (pro hac vice)
Gabor Balassa (pro hac vice)
Christina Briesacher (pro hac vice)
Mark Premo-Hopkins (pro hac vice)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: emily.nicklin@kirkland.com
        gabor.balassa@kirkland.com
        christina.briesacher@kirkland.com
        mark.premohopkins@kirkland.com

Attorneys for Defendant
*PricewaterhouseCoopers LLP*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STEVE RABIN and JOHN CHAPMAN, on behalf of themselves, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>Defendant. | CASE NO. 3:16-cv-02276-JST<br><br>**DEFENDANT PRICEWATER-HOUSECOOPERS LLP'S RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CONDITIONAL CERTIFICATION**<br><br>Judge:　　　Judge Jon S. Tigar<br>Hearing Date: November 1, 2018<br>Time:　　　2:00 p.m.<br>Courtroom:　9 - 19th Floor |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Introduction ........................................................................................................... 1

Argument ............................................................................................................... 1

I.     Plaintiffs' Revised Collective Definition Does Not Cure the Defects of Their
       Initial Collective Certification Motion. ...................................................... 1

       A.     Plaintiffs Fail To Propose A Collective Definition That Allows For Notice To
              Identifiable Collective Members ........................................................ 2

       B.     Plaintiffs Cannot Broadly Disseminate Their Notice, Only To Have Notice
              Recipients Self-Determine Whether They Meet The Collective Definition ........... 7

       C.     Chapman's Failure To Pass The Initial Screen Does Not Make Him Similarly
              Situated To Unqualified Candidates. ................................................ 10

       D.     Plaintiffs' Criticisms Of The Initial Screen Are Unfounded And, In Any
              Event, Do Not Support Their Proposed Blanket Notice. ......................... 11

              1.     Plaintiffs Must Show That Their Proposed Collective Is Not
                     Overbroad; Not That PwC's Initial Screen Is. ........................ 12

              2.     Plaintiffs' Discriminatory Effect Argument Is Irrelevant To Plaintiffs'
                     Burden Here. ..................................................................... 13

II.    Plaintiffs' "New" Evidence Fails to Support Their Claims of An Alleged
       Discriminatory Policy ............................................................................. 15

       A.     The PwC Policies And Practices That Plaintiffs Identify Are Lawful And
              Non-Discriminatory. ......................................................................... 16

       B.     Plaintiffs "Evidence" Of Ageist Bias Is Mischaracterized, Misinterpreted, Or
              Reflects Unique, Isolated Incidents. ................................................ 17

              1.     Rejecting Applicants With Too Much Experience Is Lawful, And
                     Plaintiffs Rely On Misstated "Evidence" To Suggest Otherwise ......... 17

              2.     Plaintiffs Fail To Establish That PwC Fosters A Culture Of Age Bias ..... 19

              3.     Plaintiffs' Allegations That PwC Stigmatizes Older Applicants Are
                     Based On Misstated "Evidence" Or Isolated Incidents ................. 19

       C.     Dr. Neumark's Aggregate Counts Are Not Evidence Of A Single
              Discriminatory Policy ....................................................................... 20

III.   Plaintiffs' Notice Proposal Is Premature and Inappropriate ..................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Inter-Con Sec. Sys., Inc.*,
    242 F.R.D. 530 (N.D. Cal. 2007) ................................................................................21

*Alvarez v. Farmers Ins. Exch.*,
    2014 WL 4685031 (N.D. Cal. Sept. 19, 2014) ......................................................3, 20

*Baltazar v. US Airways Grp., Inc.*,
    2013 WL 4654567 (D. Ariz. Aug. 30, 2013) ........................................................21, 22

*Bay v. Times Mirror Magazines, Inc.*,
    936 F.2d 112 (2d Cir. 1991) ....................................................................................18

*Brickey v. Dolgencorp., Inc.*,
    272 F.R.D. 344 (W.D.N.Y. 2011) ............................................................................19

*Church v. Consol. Freightways, Inc.*,
    137 F.R.D. 294 (N.D. Cal. 1991) ...............................................................................3

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
    254 F.3d 882 (9th Cir. 2001) ...................................................................................16

*Coleman v. Quaker Oats Co.*,
    232 F.3d 1271 (9th Cir. 2000) .................................................................................18

*Creten-Miller v. Westlake Hardware, Inc.*,
    2009 WL 2058734 (D. Kan. July 15, 2009) ............................................................21

*Durante v. Qualcomm, Inc.*,
    2003 WL 27374133 (S.D. Cal. June 18, 2003) ...........................................................3

*Genesis Healthcare Corp. v. Symczyk*,
    569 U.S. 66 (2013) .....................................................................................................3

*Gessele v. Jack in the Box, Inc.*,
    2013 WL 1326563 (D. Or. Jan. 28, 2013) ...............................................................19

*Gomez v. Reinke*,
    2008 WL 3200794 (D. Idaho Aug. 7, 2008) ...........................................................21

*Heath v. Google Inc.*,
    215 F. Supp. 3d 844 (N.D. Cal. 2016) .............................................................. *passim*

*Heath v. Google, Inc.*,
  Case No. 5:15-cv-01824-BLF, 12/06/16 Not. of Cond. Cert., (ECF No. 125-1)
  (N.D. Cal.)........................................................................................................11, 21

*Heath v. Google Inc.*,
  Case No. 5:15-cv-1824-BLF, 8/30/17 Pl's Am. Mot. to File a Second Am.
  Compl., (ECF No. 214) (N.D. Cal. 2016)...................................................................13

*Jianqing Wu v. Special Counsel, Inc.*, 54 F. Supp. 3d 48 (D.D.C. 2014),
  *aff'd*, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015) .................................................18

*K.H. v. Sec'y of Dep't of Homeland Sec.*,
  2018 WL 3585142 (N.D. Cal. July 26, 2018)...............................................................3

*Koren v. SUPERVALU, Inc.*,
  2003 WL 1572002 (D. Minn. Mar. 14, 2003) .............................................................14

*Kress v. PricewaterhouseCoopers LLP*,
  263 F.R.D. 623 (E.D. Cal. 2009) ................................................................................20

*Landry v. Swire Oilfield Servs. LLC*,
  252 F.Supp.3d 1079 (D.N.M 2017) ............................................................................21

*Lewis v. Wells Fargo & Co.*,
  669 F. Supp. 2d 1124 (N.D. Cal. 2009) ........................................................................3

*Luque v. AT & T Corp.*,
  2010 WL 4807088 (N.D. Cal. Nov. 19, 2010) ............................................................22

*Lusardi v. Xerox Corp.*,
  118 F.R.D. 351 (D.N.J. 1987) ....................................................................................14

*Margulies v. Tri-Cty. Metro. Transp. Dist. of Oregon*,
  2013 WL 5593040 (D. Or. Oct. 10, 2013)...................................................................20

*Mooney v. Arabian Am. Oil Co.*,
  1993 WL 739661 (S.D. Tex. Aug. 25, 1993) ..............................................................14

*Rabin v. PricewaterhouseCoopers LLP*,
  No. 16-CV-02276-JST, 2018 WL 3585143 (N.D. Cal. 2018)............................. *passim*

*Reyes v. Tex. Ezpawn, L.P.*,
  2007 WL 4530533 (S.D. Tex. Dec.19, 2007) ..............................................................21

*Roberts v. Target Corp.*,
  2013 WL 5256867 (W.D. Okla. Sept. 17, 2013) .........................................................19

*Sanchez v. Sephora USA, Inc.*,
  2012 WL 2945753 (N.D. Cal. July 18, 2012)...................................................4, 20, 21

*Saravia v. Dynamex, Inc.*,
   310 F.R.D. 412 (N.D. Cal. 2015) ...................................................................................21, 22

*Stanfield v. First NLC Fin. Servs., LLC*,
   2006 WL 3190527 (N.D. Cal. Nov.1, 2006) ....................................................................21, 22

*Stein v. Nat'l City Bank*,
   942 F.2d 1062 (6th Cir. 1991) ...............................................................................................18

*Villarreal v. Caremark LLC*,
   66 F. Supp. 3d 1184 (D. Ariz. 2014) .....................................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................................................14

*Walton v. AT&T Servs., Inc.*,
   No. 15-cv-3653-VC, ECF. No. 107 (N.D. Cal. Sept. 15, 2016) ........................................3, 21

## INTRODUCTION

Plaintiffs' renewed motion for conditional certification of a collective of applicants is virtually a carbon copy of their initial motion with one principal difference: Plaintiffs have modified their proposed collective definition by adding the words "met the minimum qualifications for the positions to which they applied." (ECF No. 241 at 17) (hereinafter, "Renewed Mot."). Plaintiffs, however, are silent about how they would determine who will receive notice. Absent some reliable and verifiable way to identify who "met the minimum qualifications," the proposed collective still would not satisfy the requirement that notice be limited to persons who are "similarly situated" to the named Plaintiffs. Plaintiffs' motion for a revised collective should therefore be denied based on the same legal principles addressed by the Court's July 26, 2018 Order denying Plaintiffs' initial motion for collective certification.[1]

The balance of Plaintiffs' submission is essentially a rehash—sometimes copied word-for-word—of arguments Plaintiffs made in support of their initial motion for conditional certification. As before, these arguments are predicated on mischaracterizations of the evidence Plaintiffs cite; on statistics that Plaintiffs' statistician admitted in deposition do not show discrimination; and on PwC's national policies that in no way promote, but expressly prohibit, consideration of age in hiring.

Finally, as before, Plaintiffs' proposed notice is premature, as the notice's substance will depend on the scope of the collective, if any is conditionally certified. The notice content and procedures that Plaintiffs propose would also be inappropriate for even Plaintiffs' collective definition.

Given the significance of the issues presented, PwC requests oral argument.

## ARGUMENT

### I.   PLAINTIFFS' REVISED COLLECTIVE DEFINITION DOES NOT CURE THE DEFECTS OF THEIR INITIAL COLLECTIVE CERTIFICATION MOTION.

Plaintiffs again fail to carry their burden at this "notice stage" of showing they have defined a collective sufficiently narrowly that notice will be limited to persons who are similarly situated to the

---

[1] Plaintiffs' proposed collective also fails to the extent Plaintiffs intend for it to include applicants for seasonal, part-time positions. Plaintiffs are silent on this issue, too. Having presented no evidence or said anything at all about alleged discrimination against applicants to seasonal, part-time positions, such applicants cannot be part of any collective.

named Plaintiffs.  Plaintiffs make no showing that simply adding the words "met the minimum qualifications" to their collective definition for applicants would limit the distribution of their notice to those similarly situated.  Plaintiffs' motion for a revised collective therefore fails for reasons similar to Plaintiffs' initial motion:

*First,* Plaintiffs identify no reliable and verifiable way to determine which applicants "met the minimum qualifications," so that the collective of notice recipients would exclude unqualified applicants.  Plaintiffs' proposal would require applicant-by-applicant evaluations to determine who is a collective member, contrary to the process and purpose for collective certification.

*Second,* if, despite keeping silent on the issue in their motion, Plaintiffs intend to argue in reply that notice should be sent to the entire population of 40-and-over applicants, leaving it to those applicants to self-determine whether they were qualified, that concept would be contrary to law, unprecedented, ineffective, and impractical.

*Third,* Plaintiffs' assertions that named Plaintiff John Chapman did not pass the initial screen for certain of his applications are of no moment.  Assuming that Chapman was facially qualified for the positions to which he applied, he still would not be similarly situated to applicants who fell short of basic qualifications.

*Fourth*, Plaintiffs' criticisms of PwC's initial screen are both unfounded and beside the point, as it is Plaintiffs' burden at this stage to narrow their proposed collective to a universe of persons who are similarly situated to the named Plaintiffs.

In sum, Plaintiffs' renewed motion reflects the same essential failings as their earlier motion and should likewise be denied.

### A.    Plaintiffs Fail To Propose A Collective Definition That Allows For Notice To Identifiable Collective Members.

Conditional certification is commonly referred to as "the notice stage," because "the court considers whether the plaintiff submitted sufficient evidence to justify the conditional certification of the class and the sending of notice of the action to potential class members."  *Rabin v. PricewaterhouseCoopers LLP*, No. 16-CV-02276-JST, 2018 WL 3585143, at *3 (N.D. Cal. 2018) ("*Rabin I*").  Thus, "the sole consequence of conditional certification is the 'sending of court-approved

written notice,' to the purported members of the class." *Heath v. Google Inc.*, 215 F. Supp. 3d 844, 850 (N.D. Cal. 2016) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)).  In short, conditional certification, and the similarly situated analysis at this stage, exist "for the sole purpose of sending notice of the action to potential class members." *Id.*

Even though this is a "notice stage" proceeding, Plaintiffs are silent on how they would go about limiting their notice to members of the proposed collective.  They say nothing, for instance, about how they would determine, for notice purposes, who "met the minimum qualifications for the positions to which they applied."    Plaintiffs' failure dooms their new proposed collective.

When courts in this Circuit have conditionally certified ADEA collectives, the collective definition has consistently been definite enough to allow notice to be sent to an objectively determinable and verifiable group, without the need for mini-trials to determine collective membership.[2]  Likewise, in each case that Plaintiffs cite, the collective definition allowed the parties to determine who satisfied that definition, for purposes of receiving notice, based on determinable and verifiable criteria.[3]

---

[2]  *See, e.g., Heath*, 215 F. Supp. 3d at 850 ("All individuals who interviewed in-person for any Software Engineer ('SWE'), Site Reliability Engineer ('SRE'), or Systems Engineer ('SYSEng') position with Google in the United States during the time period from August 13, 2010 through the present; were age 40 or older at the time of the interview; and were refused employment by Google."); *K.H. v. Sec'y of Dep't of Homeland Sec.*, 2018 WL 3585142, at *1 (N.D. Cal. July 26, 2018) ("All Federal Air Marshals who were impacted by the closure of the Federal Air Marshal Service's Cincinnati, Cleveland, Phoenix, Pittsburgh, San Diego, and Tampa offices and who were over 40 years of age at the time the decision to close the offices was made."); *Church v. Consol. Freightways, Inc.*, 137 F.R.D. 294, 299 (N.D. Cal. 1991) ("All persons age 40 and over who were exempt (or managerial) employees of Emery and whose employment terminated as a result of the reorganization of Emery Worldwide, by discharge, constructive discharge, forced resignation, or otherwise, during the period from April 6, 1989 through the present time."); *Durante v. Qualcomm, Inc.*, 2003 WL 27374133, at *1 (S.D. Cal. June 18, 2003) ("those who were age forty or older at the time of the layoffs (and who were deprived of the right to exercise valuable stock options)" ).

[3]  *See, e.g., Alvarez v. Farmers Ins. Exch.,* 2014 WL 4685031, at *5 (N.D. Cal. Sept. 19, 2014) ("all current and former Personal Lines Claims Adjusters employed by Farmers in California since September 19, 2011"); *Walton v. AT&T Servs., Inc.,* No. 15-cv-3653-VC, ECF. No. 107 at 1 (N.D. Cal. Sept. 15, 2016) ("employees in the job classifications of 'Senior Training Manager Design' and 'Senior Training Manager Delivery' who were classified by the employer as exempt from overtime subject to the arbitration and time frame restrictions in the complaint"); *Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124, 1128-29 (N.D. Cal. 2009) ("technical support workers with the primary duties of installing, maintaining, and/or supporting software and/or hardware, including but not limited to network engineers, but excluding PC/LAN Engineers, who were, are, or will be misclassified by Defendant as exempt from overtime pay" in a case where technical support workers "were uniformly classified as exempt from overtime pay by Defendant"); *Sanchez*

Plaintiffs therefore bear the burden of proposing a collective that allows for notice to an identifiable population of persons who are "similarly situated" to the named Plaintiffs. *Heath*, 215 F. Supp. 3d at 850 ("The named plaintiffs bear the burden to show that they and the proposed class members are 'similarly situated'"). With respect to qualifications, Plaintiffs must define their collective so that notice would be sent only to persons who are at least facially qualified for the positions sought, as the named Plaintiffs have alleged about themselves. *Rabin I*, 2018 WL 3585143 at *5 ("Chapman and Rabin cannot make this showing, because they are not similarly situated to facially unqualified applicants."); *Heath*, 215 F. Supp. at 857 ("even under the lenient standard for stage one conditional certification, members of Heath's proposed class are not similarly situated to Heath, who purports to have been qualified for the positions to which he applied."). They have not met this burden.

Plaintiffs offer no explanation for how the term "met basic qualifications" would apply in practice to limit the notice collective to persons who are similarly situated to the named Plaintiffs. Other than the results of the pre-interview screening process addressed in the Court's July 26, 2018 order, there exists no data that could be used to exclude unqualified applicants from the population of applicants in a reliable and verifiable way, without giving rise to factual disputes that would require the equivalent of applicant-by-applicant mini-trials to resolve.

In December 2016, PwC provided Plaintiffs with a list of approximately 1,900 fields in PwC's Source1 system. (ECF No. 112 at 4-5). Among those 1,900 data fields, Plaintiffs identify none that provides an automated answer to whether an applicant satisfies basic qualifications for a given position. Plaintiffs' own expert, Dr. Neumark, testified that Plaintiffs possess no information—aside from whether an applicant passed the initial screen—to determine whether an applicant met minimum qualifications. (Ex. A, Neumark Tr. at 141:5-13).[4] Further, Plaintiffs do not claim in their renewed

---

*v. Sephora USA, Inc.,* 2012 WL 2945753, at *1, *6 (N.D. Cal. July 18, 2012) ("All individuals who were (a) employed by Sephora as a Specialist within the past three years prior to this action's filing date and through the final disposition of this lawsuit; and (b) paid a 'salary' with no overtime compensation.").

[4] As the Court is aware, Plaintiffs had an opportunity to request data from PwC—a request they made with respect to specific fields in December 2016 and that Plaintiffs were authorized to

motion that additional data would allow them to determine in any objective and readily discernable way whether an applicant satisfied basic qualifications.[5]  Instead, the only data that Plaintiffs seek in their motion is undifferentiated ***contact information*** for all 40-and-over applicants to Covered Positions, regardless of whether they satisfied basic qualifications.  (Renewed Mot. at 24).  Notably, that is the same information Plaintiffs sought for purposes of sending notice to putative collective members who applied to PwC under their initial, overbroad motion.  (Plaintiffs' Original Motion for Collective Certification, ECF No. 198 at 23-24) (hereinafter, "Orig. Mot.").[6]  It would do ***nothing*** to answer the gating question of who meets basic qualifications.

Determining whether a given applicant meets basic qualifications entails a mix of individualized quantitative and qualitative assessments.  To start, basic qualifications vary from position to position.  (*See*, *e.g.*, Pl. Exs. 74-78).  The data upon which Dr. Neumark relied for his analyses encompasses applications to over 3,700 distinct job titles.[7]  Not surprisingly, there exist varying requirements across different jobs, including as to required degree, professional experience, and certifications.  While Plaintiffs assert that covered positions require only a handful of basic

---

supplement multiple times over the following eight months.  (*See, e.g.*, ECF No. 105 at 3, ECF No. 135, and ECF No. 151).

[5]  Plaintiffs deposed a PwC corporate representative whom PwC had designated to testify about the meaning of any of the 1,900 fields on the list PwC had provided Plaintiffs.  (Ex. B, Second Amended Notice of Deposition (listing topics including "The content, scope of coverage, usage of, and access to, all data sets . . . that contain: . . . applicant and application information, including ratings, evaluations, inputs, recommendations, or other data utilized to make or document hiring and decisions of candidates"); Ex. C, Resp. and Obj. to Second Amended Notice of Deposition (agreeing to "produce a designee to testify about the SourceOne data forms and their data fields" reflected in list of approximately 2,000 fields, "including their content and scope of coverage" and "how the data is used")).  In March 2017, PwC's corporate deponent testified that she was "prepared to speak to those fields today in a representative capacity."  (Ex. D, Farmer Dep. Tr. at 206:7-14).

[6]  After this Court issued its July 26 Order, Plaintiffs made an informal request by email for additional information—asking for the frequency with which over 140 fields in PwC's Source1 data are populated with information from among 255,000 applications in PwC's September 2017 data production.  Notwithstanding the burden this request presented, PwC undertook to analyze the frequency of the fields for which the names suggested they might answer the question of whether someone satisfied basic qualifications.  PwC reported to Plaintiffs' counsel that those fields, labeled "Basic Qualification Details," "Basic Qualifications," "Candidate meets basic qualifications for requisition posting?," and "Years_Prof_Exp" were each populated at less than one tenth of one percent of the time.  (Ex. E, 8/24/2018 Balassa email to Sagafi).

[7]  *See* Pl Ex. 31, December 7, 2017 Neumark Report at 24, Appendix B (listing "*PWC - Applicant Data_Raw.xlsx*" as a material Neumark considered.).

qualifications, (Renewed Mot. at 17), the documents they cite reflect the requirements for only certain positions, not every job in Assurance and Tax.  (Renewed Mot. at 17-18 & n.64).[8]  Plaintiffs' renewed motion adds a new declarant, Darryl Tolliver, who illustrates the issue.  Tolliver states he applied to compliance and risk-assurance positions, among others, in PwC's Assurance line of service.  (Pl. Ex. 24 ¶3).  He then asserts, "I believe I was qualified for the positions I applied for," by virtue of experience in compliance, regulatory-reporting jobs and in the insurance industry.  (*Id.* ¶5).  But Tolliver was not a CPA, and nowhere indicates that he was committed to pursuing a CPA license, which plaintiffs assert are essential qualifications for positions in the Assurance line of service. (Renewed Mot. at 17).  If Tolliver is correct that he was qualified for the positions to which he applied, that would mean the question of whether he meets basic qualifications entails more than applying the list Plaintiffs have included across all 3,700-plus positions.[9]

Moreover, even among the criteria Plaintiffs have identified, determining whether an applicant was qualified cannot be readily accomplished for the over 9,000 applicants who were age 40 and over.[10]  To be sure, some qualifications are quantitative, such as GPA.  But others are qualitative, such as prior ***relevant*** experience, which is a basic requirement for experienced-level positions (experienced associate and senior associate) (*see*, *e.g.*, Pl. Exs. 75-76), to which over 85 percent of 40-and-over applicants exclusively applied.  (Pl. Ex. 31, Neumark Report at 12, 14, Tables 1, 3 (among a total 9,032 applicants 40 and over, 1,321 applied at least once to associate-level (campus) positions, meaning 7,711 applied only to experienced-level positions)).  Likewise, PwC generally requires that

---

[8]  Plaintiffs also misstate PwC's prior statements about minimum qualifications.  PwC's response to the original conditional certification motion noted that GPA, relevant major, and work experience were ***some*** of the basic qualifications for the covered positions, not the only ones.  (*See* PwC's Response in Opposition to Plaintiffs' Original Motion for Conditional Certification, ECF No. 211 at 13 (hereinafter "Orig. PwC Resp.") (explaining that applicants must "meet strict qualifications for Covered Positions, ***including*** a degree in a relevant field of study, minimum GPA requirements, and, for Experienced and Senior Associate positions, relevant work experience") (emphasis added).).

[9]  Tolliver contends that a PwC "recruiting manager" opined that he had the experience required for one of the several Assurance positions to which he applied.  (Pl. Ex. 24 at 1).  This assertion further demonstrates the potential for factual disputes that Plaintiffs' proposed collective definition could present simply to determine collective membership.

[10]  *See* Pl. Ex. 31, Neumark Report at 12, Table 1 (identifying 9,032 applicants 40 and over).

applicants have a degree in a relevant field of study (*see* Pl. Exs. 74-78), and determining whether an applicant's major qualifies as "relevant" would be a qualitative assessment that varies from position to position, for both campus-level and experienced-level positions.[11]  Given the qualitative aspects of this assessment, disagreements over who met basic qualifications and who did not would likely lead to disputes before this Court with respect to each such applicant.[12]  A battery of mini-trials on who meets the collective definition would vitiate the entire purpose of the collective notice procedure.  *See Heath*, 215 F. Supp. 3d at 850-51 ("similarly situated" requirement reflects policy that "hearing the claims together promotes judicial efficiency").  And, given the over 9,000 40-and-over applicants to the Covered Positions, it would render the determination of collective membership unmanageable.  At bottom, Plaintiffs' failure to advance any proposal for determining who "met the minimum qualifications" and thus should receive notice, should be fatal to Plaintiffs' renewed motion.

**B.    Plaintiffs Cannot Broadly Disseminate Their Notice, Only To Have Notice Recipients Self-Determine Whether They Meet The Collective Definition**.

Given Plaintiffs' silence on the issue, PwC is in the untenable position of guessing at how Plaintiffs might propose defining the population of persons who "met basic qualifications."  The substance of Plaintiffs' proposed consent-to-join form suggests that Plaintiffs *might* expect that collective members will self-assess whether they were qualified for the positions for which they applied, and to concede if they did not.  Specifically, the proposed form includes a boilerplate statement that the opt-in plaintiff "met the minimum qualifications for the position to which I applied." (Pl. Ex. 2 at 1).[13]  If Plaintiffs are, *sub silentio*, proposing here that notice would be sent to *all* 40-and-

---

[11]   *See, e.g.,* Pl. Ex. 75 (Assurance Experienced Associate job posting requiring "Bachelor's degree in accounting or other *business field of study*") (emphasis added).

[12]   An audit position in the Assurance line of service requires a CPA or "commitment to" pass the CPA exam.  (*See* Pl. Exs. 74, 75, 77).  Positions in Tax, by comparison, may require achievement of, or commitment to achieve, a CPA license, a law degree, or an Enrolled Agent license, while other tax positions require, more generally, "appropriate primary credentials" for the particular position.  (*See* Pl. Exs. 76, 78.)  Thus, depending on the particular position and applicant, the credentialing requirement could be readily discernable (*e.g.*, if applicant is certified as a CPA) or more subject to dispute (*e.g.*, if the applicant claims a "commitment to" a necessary credential, or, for certain tax positions, claims to have "appropriate primary credentials" other than a CPA, J.D., or Enrolled Agent license/certificate).

[13]   Plaintiffs' proposed notice provides no information about what the minimum qualifications were for the Covered Positions.  (Pl. Ex. 1).

over applicants to Covered Positions, and for those recipients to then  self-assess whether they possessed the requisite qualifications for the positions to which they applied (and to stand down if they did not), Plaintiffs' approach would be contrary to law, unprecedented, ineffective, and impractical.

For starters, sending notices to the over 9,000 applicants to Covered Positions who were 40 and over would mean sending notice to precisely the same population that Plaintiffs previously moved (unsuccessfully) for permission to include in the preliminary collective. *Rabin I*, 2018 WL 3585143, at *6. Such an undifferentiated population would be undeniably overbroad, as it would include "an untold number of facially unqualified applicants," who are not "similarly situated" to the named Plaintiffs. *Id.*; *Heath*, 215 F. Supp. 3d at 857. For this reason alone, the concept of a blanket notice to a group that includes persons who do not fit Plaintiffs' revised collective definition should be rejected.

Moreover, there is no basis in the law for excusing Plaintiffs from defining their collective to allow, for purposes of sending notice, a reliable determination of who fits the collective definition. Plaintiffs do not cite a single case, and PwC has found none from any jurisdiction, in which a court authorized notice to be sent to an undeniably overbroad group, and for collective membership to be determined later.[14] To the contrary, in every case Plaintiffs have cited, the courts approved collective definitions that allowed membership to be determined before the notice issued.[15] Plaintiffs fail to explain why this Court should become the first to allow a collective definition that sanctions notice to a group that is not similarly situated, when conditional certification exists "for the sole purpose of sending notice of the action to potential class members." *Heath* 215 F. Supp. 3d at 850.

Further, assertions by notice recipients on a boilerplate document that they satisfied basic qualifications for the positions to which they applied would not avoid the need for evidentiary proceedings to determine collective membership. Plaintiffs' own submission in this case confirms the unreliability of notice recipients self-determining whether they qualify as collective members. One of the putative collective members whom Plaintiffs hand-picked to submit a declaration in support of

[14]   *See* note 2, *supra*.

[15]   *See* note 3, *supra*.

their original motion, Sherene Lane-Pryce, applied to PwC "on average" two to three times a month from 2013 through at least late 2016, but lacked the requirements for the positions to which she applied. (Pl. Ex. 137 to Orig. Mot., ECF No. 198-8.)  Her degrees were in Criminal Justice, English, and Public Administration, and her work experience was in law firms as a paralegal and conflict of interest analyst. (*Id.* at 1-2; Ex. A).  She therefore did not meet basic qualifications for any jobs in the Tax or Assurance lines of service.  Nevertheless, Lane-Pryce declared that she "*was applying to positions for which I was highly qualified.*" (*Id.* at 2 (emphasis added)).  While Plaintiffs have dropped Lane-Price from their selection of declarations submitted in support of this motion, that does not change the fact Lane-Price assessed herself as being "highly qualified."  Plaintiffs' approach here would invite additional, erroneous assertions from notice recipients completing consent-to-join forms. PwC would then have a responsibility to evaluate and contest the notice recipients' self-serving say-so.  But post-notice mini-trials (like pre-notice ones) to determine whether notice recipients meet Plaintiffs' collective definition would gut the purpose of the "notice stage" proceeding and would render unworkable the collective construct. *See Heath*, 215 F. Supp. 3d at 850-51 ("similarly situated" requirement reflects policy that "hearing the claims together promotes judicial efficiency").

Finally, from a practical standpoint, determining post-notice if opt-ins met basic qualifications would be functionally equivalent to the dispute-resolution sequencing that Plaintiffs proposed in their first attempt at conditional certification.  A threshold issue for any individual opt-in, as a prima facie requirement to stating a claim, is whether the individual was qualified for the position sought, and thus was similarly situated to the named plaintiff claiming such qualification. *Rabin I*, 2018 WL 3585143 at *5 ("it is hard to imagine how unqualified applicants could ever be part of the class, given that an ADEA plaintiff 'must show, among other things, that he was qualified for the position.'") (citing *Heath*, 215 F. Supp. 3d at 857).  Under any collective definition, an opt-in plaintiff must be qualified to be part of the collective.

For instance, Plaintiffs' initial notice proposal contemplated that PwC could evaluate the opt-ins' credentials and potentially challenge those that were facially unqualified as neither being similarly situated to the named Plaintiffs nor satisfying the essential requirements for an ADEA claim.  But such

individualized challenges would have occurred *after* recipients returned the broadly distributed notices.  At oral argument, Plaintiffs specifically urged that the issue of meeting basic qualifications was for another day, after notice recipients had opted in and additional discovery occurred, asserting: "[T]here will be, *after discovery, ways for Your Honor to parse through the collective and to award the remedies to the folks who are appropriately qualified* and who have been injured by PwC's common policy of discrimination."  (Feb. 27, 2018 Hr'g Tr. at 26:19-23 (emphasis added); *see also id*. at 79:15-18 (Plaintiffs' counsel asserting, erroneously, that *Heath v. Google* supported determining qualifications as a "second-stage question")).

In rejecting Plaintiffs' kick-the-can approach, this Court held that the question of whether members of the collective are similarly situated to Plaintiffs (in terms of meeting basic qualifications) was not a question for another day, but had to be determined at this notice phase.  *Rabin I*, 2018 WL 3585143, at *6; *Heath*, 215 F. Supp. 3d at 857.  Thus, post-notice determinations would land the parties in essentially the same spot as Plaintiffs' earlier proposal to resolve later disputes over whether individuals meet basic qualifications.

In sum, Plaintiffs have failed to articulate how membership in their revised collective would be determined for purposes of giving notice to collective members.  Given the impracticality of doing so (other than by looking to the outcome of PwC's screening process), and given the resulting factual disputes over collective membership, Plaintiffs' proposed collective should be rejected.

### C.   Chapman's Failure To Pass The Initial Screen Does Not Make Him Similarly Situated To Unqualified Candidates.

In response to the Court's July 26 Order, Plaintiffs now assert that named Plaintiff John Chapman was discriminated against with respect to applications submitted between fall 2013 and spring 2016, because he was purportedly qualified for those positions but did not pass the initial screen. (Renewed Mot. at 21).  The fact Chapman did not pass the initial screen for some of the positions to which he applied does nothing to cure the defect identified in the Court's July 26 Order:  Whether or not he passed the initial screen, Chapman is *not* similarly situated to the mass of persons who applied to PwC and were unqualified.  *Rabin I*, 2018 WL 3585143, at *5.

*Heath v. Google* is instructive.  There, plaintiff Robert Heath asserted that he did not pass Google's initial screen even though he was purportedly qualified for the position.  215 F. Supp. 3d at 849.  Even so, the court rejected his motion to represent a collective of persons who did not pass the initial screen, because the proposed collective included persons who were facially unqualified.  *Id.* at 857.  The same result should follow here.  Because "Plaintiffs do not dispute that their proposed collective includes unqualified applicants," Plaintiffs' additional assertions about Chapman's application history do not change the conclusion that "[t]he difference between Rabin and Chapman on the one hand, and facially unqualified applicants on the other, prevents the Court from conditionally certifying the class."  *Rabin I*, 2018 WL 3585143, at *5.[16]

### D.    Plaintiffs' Criticisms Of The Initial Screen Are Unfounded And, In Any Event, Do Not Support Their Proposed Blanket Notice.

In failing to specify an identifiable group to receive notice, Plaintiffs reject a potential alternative: using PwC's "initial screen" to exclude facially unqualified applicants.  *Rabin I*, 2018 WL 3585143, at *5-6.  In *Heath v. Google*, the defendant had a screening process that excluded candidates "based on their lack of qualifications" before they were interviewed.  215 F. Supp. 3d at 857.  The court conditionally certified a collective of applicants aged 40 and over who "interviewed *in person* for [relevant positions] with Google," while rejecting a proposed collective of persons rejected at any stage.  *Id.* at 853 (emphasis added).  The approved definition therefore allowed for the objective identification of persons who would receive notice.  *See Heath v. Google Inc.*, Case No. 5:15-cv-1824-BLF, 12/06/16 Not. of Cond. Cert., (ECF No. 125-1) at 1 (notice to "All individuals who: interviewed in-person for [relevant positions] with Google Inc. ('Google') in the United States; were age 40 or older at the time of the interview; were refused employment by Google; and received notice that they were refused employment from August 28, 2014 to October 5, 2016.").

The approach Plaintiffs have proposed here is a vast departure from the *Heath* court's straightforward path to determining a collective to receive notice.  Presumably recognizing this,

---

[16]  The *Heath* court also denied Heath's request "to either narrow the scope itself or allow him to file a renewed motion for conditional certification" to some middle-ground between all applicants and those who had been interviewed in person.  215 F. Supp. 3d at 858.

Plaintiffs devote much of their motion to disputing that PwC's "initial screen" is an appropriate "proxy" for determining whether an applicant met basic qualifications for a given position. First, Plaintiffs argue that the initial screen is an imperfect proxy for whether applicants meet minimum qualifications because PwC excludes not only persons who failed to satisfy basic qualifications, but also excludes those who met basic qualifications but did not satisfy the "preferred skills" for the specific position at issue. (Renewed Mot. at 18-21). Second, Plaintiffs contend that PwC allegedly discriminates in the initial screening process. *Id*. These arguments, however, miss the point. The issue before the Court is whether ***Plaintiffs*** have met their burden to propose a collective that will result in notice being sent only to those applicants that are similarly situated to the named Plaintiffs, *Rabin I*, 2018 WL 3585143, at \*3; *Heath*, 215 F. Supp. 3d at 850, not whether ***PwC*** has identified an ideal method for distinguishing between unqualified and minimally-qualified applicants.

### 1. Plaintiffs Must Show That Their Proposed Collective Is Not Overbroad; Not That PwC's Initial Screen Is.

At this notice stage, it is Plaintiffs' burden to show that their proposed collective is sufficiently ascertainable so that only those similarly-situated to the named Plaintiffs will receive notice. *Rabin I*, 2018 WL 3585143, at \*3; *Heath*, 215 F. Supp. 3d at 850. As the *Heath* court recognized, a screening cutoff that excludes facially unqualified applicants can satisfy this requirement. *Rabin I*, 2018 WL 3585143, at \*6; *Heath*, 215 F. Supp. 3d at 857.

Notably, the *Heath* court recognized that requiring an initial screen cutoff would ***exclude*** named plaintiff Heath, who claimed to have been qualified and who was rejected before an in-person interview. *Id.* at 849. Nevertheless, the *Heath* court limited the collective to those who passed the initial screen and made it to an in-person interview. *Id.* at 859. The court reasoned that Heath, who claimed to be qualified and was rejected before an in-person interview, was not similarly situated to the "unknown number" of unqualified applicants that were also screened out. *Id.* In other words, the outcome in *Heath* turned on the fact the Google screen excluded essentially all unqualified applicants, not on the notion that it excluded ***only*** unqualified applicants. Likewise, here, it is Plaintiffs' burden to offer a workable approach (which might be, but need not be, an initial screen) for excluding the "unknown number" of applicants who did not meet the basic qualifications for the positions at issue.

DEFENDANT'S RESPONSE IN OPPOSITION TO
RENEWED MOTION FOR CONDITIONAL
CERTIFICATION

12

CASE NO. 3:16-CV-02276-JST

While Plaintiffs may or may not propose using the initial screen for this purpose, what they cannot do is to define their proposed collective in a way that entails sending collective notice to applicants who do not meet basic qualifications. *Rabin I*, 2018 WL 3585143, at *5; *Heath*, 215 F. Supp. 3d at 857.

### 2. Plaintiffs' Discriminatory Effect Argument Is Irrelevant To Plaintiffs' Burden Here.

Plaintiffs next argue that PwC discriminates in the initial screening process. This argument is not new; Plaintiffs made the same assertion in their Reply in Support of Conditional Certification. (*See* Reply, ECF No. 218, at 11-13). Plaintiffs, however, cannot bypass the gating procedural question of whether the named Plaintiffs are similarly situated to members of the proposed collective by arguing the ultimate, substantive issue.

If PwC actually discriminated on the basis of age in its initial screen (and it does not), an aggrieved applicant could presumably assert an individual ADEA claim. That is the recourse the *Heath* court afforded plaintiff Heath when it limited the collective there to persons who reached an in-person interview (which Heath did not).[17] But whether a collective notice procedure is appropriate turns on whether members of the proposed collective, who would receive notice, are similarly situated to the named Plaintiffs. *Rabin I* 2018 WL 3585143 at *3. As discussed, a proposed collective that would entail giving notice to facially unqualified applicants does not satisfy this standard, irrespective of Plaintiffs' allegations of discrimination. Simply put, allegations of discrimination do not allow Plaintiffs seeking conditional certification to dispense with the "similarly situated" requirement.

While now is not the time for PwC to address Plaintiffs' merits arguments, it bears reiterating that PwC's initial screen is a necessary, non-discriminatory, and efficient means of culling out unqualified applicants from its highly competitive hiring process.[18] In arguing that the screen is

---

[17] *See Heath v. Google Inc.*, Case No. 5:15-cv-1824-BLF, 8/30/17 Pl's Am. Mot. to File a Second Am. Compl., (ECF No. 214) at 1.

[18] *See* Pl. Ex. 37 at PWC_00000713 ("The initial screening is used to confirm that prospective candidates meet the basic qualifications of the position and, if so, to determine to what extent they possess the preferred skills and knowledge stated in the requisition."). From August 2013 to June 2017, PwC received over a quarter million applications to Associate, Experienced Associate, and Senior Associate positions in Tax and Assurance from 118,878 job-seekers. (Pl. Ex. 31, Neumark Report at 24, Appendix B; Ex. A, Neumark Tr. at 34:13-17). According to Plaintiffs, PwC made offers of full-time employment to only 13,932 of these applicants. (Pl Ex. 31, Neumark Report at 12, Table 1); *see also* Pl. Ex. 7, Barnhart Decl. ¶¶ 4, 9 (campus applicant rejected without an

applied in a discriminatory manner across applicants, Plaintiffs misplace their reliance on Dr. Neumark's analysis.   Such statistical evidence is not relevant to the question at the conditional certification stage: whether the members of the proposed collective were all victims of the same decision, policy, or plan.[19]  Dr. Neumark admitted the same in deposition, conceding he has done "no work to determine if any difference in hiring rates was attributable to a particular policy or practice at PwC." (Ex. A, Neumark Tr. at 146:2-6).

Nor does Dr. Neumark's analysis speak to the broader question of whether PwC discriminates against older applicants in the screening process.   In deposition, Dr. Neumark testified that the statement in his report that "the data are consistent with discrimination" is only intended to identify discrimination as one *of many possible explanations* for differences in hiring rates between older and younger applicants.  (Ex. A, Neumark Tr. at 139:10-144:2).  Dr. Neumark has neither performed any analysis nor expressed any opinion on whether the difference he observed here is caused by "discrimination, on the one hand," or "non-discriminatory factors that correlate with age on the other hand."  (*Id*. at 141:14-20).  Thus, he admits his analyses *say nothing at all about "whether or to what extent discrimination is contributing to the observed difference in hiring rates."*  (*Id*. at 143:21-144:2 (emphasis added)).[20]  Dr. Neumark's supplemental reports, dated February 8, 2018 and August

---

interview and told "I did not meet their qualifications"); Ex. A to PwC's Response in Opposition to Plaintiffs' Original Motion for Conditional Certification (hereinafter "Orig. PwC Resp."), Merschel Decl. ¶ 8, ECF No. 211-2).

[19]  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 356-57 (2011) (statistical evidence of a gender disparity in promotion was "insufficient to establish that [plaintiffs'] theory can be proved on a classwide basis," because the fact of an overall statistical disparity does not mean the disparity was caused by a uniform policy); *Koren v. SUPERVALU, Inc*., 2003 WL 1572002, at *16 (D. Minn. Mar. 14, 2003) (plaintiffs' proffered statistical data was irrelevant to a decertification analysis, because "statistical evidence does 'not address the similarly situated requirement'"); *Mooney v. Arabian Am. Oil Co*., 1993 WL 739661, at *9 n. 10 (S.D. Tex. Aug. 25, 1993) (decertifying collective because statistical evidence was not relevant to the "similarly situated" inquiry and there was no indication each termination decision was part of a uniform plan); *Lusardi v. Xerox Corp*., 118 F.R.D. 351, 376 n. 41 (D.N.J. 1987) ("Plaintiffs have offered statistical data and expert opinions based upon statistical data" but "this does not address the similarly situated requirement" because "the fact that a reduction in force reduces the average age of the remaining employees does not support an inference that a particular employee was fired because of age.").

[20]  Dr. Neumark's report merely claims that "something is leading to higher hiring rates for younger workers versus older workers," but "does not analyze whether that something is [1] discrimination or is [2] non-discriminatory factors that correlate with age." (Ex. A, Neumark Tr. at 64:4-11; *Id*. at 67:11-17 (asserting his analyses are "documenting age differences, and that's all")).

25, 2018, do nothing to address these deficiencies.  Adopting the same approach, those reports likewise include no controls for qualifications or other explanatory variables, nor do they contain any opinion that differences in rejection rates are attributable to discrimination.  (*See* Pl Ex. 32 at ¶3; Pl Ex. 33 at ¶4).  At bottom, Dr. Neumark's opinions are of no moment on the issue of whether Plaintiffs have proposed a sufficiently narrow collective definition.[21]

## II.     PLAINTIFFS' "NEW" EVIDENCE FAILS TO SUPPORT THEIR CLAIMS OF AN ALLEGED DISCRIMINATORY POLICY.

Plaintiffs' renewed motion recycles from their original motion the same arguments and the same purported evidence that age bias "infects" PwC's age-neutral policies.  (Renewed Mot. at 2).  Plaintiffs' support for this allegation again consists entirely of isolated anecdotes, documents that do not say what Plaintiffs claim they say, and bare, aggregated hiring disparities.  PwC briefly responds here to these arguments, recognizing that the Court has reserved further consideration on these distinct

---

[21]  Plaintiffs' renewed collective motion cannot include applicants to seasonal, part-time positions.  In their original motion for conditional certification, Plaintiffs defined their proposed collective to include only applicants to "a full-time Covered Position," thereby excluding those who applied to PwC's part-time, seasonal Flexible Talent Network ("FTN") roles.  (Orig. Mot. at 18-19; *see also* Ex. A, Neumark Tr. at 170:21-24, 171:8-10 (Plaintiffs' statistician testifying he excluded seasonal (FTN) positions from analyses, at Plaintiffs' direction)).  After PwC noted this exclusion in its response brief, Plaintiffs replied that FTN applicants should be included in their putative collective as "deterred" or "attempted" applicants.  (*See* Reply, ECF No. 218, at 13 ("Attempted applicants are those who applied to FTN (i.e., non-Covered) positions")).  In its July 26 ruling, the Court stated that a collective could not include persons who attempted to apply for full-time positions but allegedly were "steered away from covered positions into seasonal positions," because they were not similarly situated to the named Plaintiffs.  *Rabin I*, 2018 WL 3585143, at *6.  Thus, in its latest form, Plaintiffs' proposed collective excludes "deterred" or "attempted" applicants.  Notably, Plaintiffs' renewed motion does not mention FTN or seasonal positions at all, and Plaintiffs' purported statistical evidence again carves out FTN from the analysis.  (*See, e.g.*, Pl. Ex. 33 at 4, Table 8, Notes (Dr. Neumark's August 25, 2018 report, submitted in support of renewed motion, includes applications "only if the application was ***not for an FTN position***." (emphasis added)).  FTN is referenced (indirectly) in just three declarations.  (Pl. Ex. 12, Halliday Decl. ¶¶ 4-5; Pl. Ex. 13, Hearn Decl. ¶¶4, 11-14; Pl. Ex. 22, Rabin Decl. ¶¶ 9-10).  Neither these declarations, nor anything else in Plaintiffs' renewed motion, in any way shows a firm-wide "decision, policy, or plan" of discrimination in FTN hiring, thus FTN cannot be included in any purported collective.  *See Heath*, 215 F. Supp. 3d. at 850.  Further, having previously argued that PwC intentionally ***steers*** older applicants ***into*** such positions, is would make no sense for Plaintiffs to claim that PwC strives to keep older applicants ***out*** of such positions.

issues until decertification. Accordingly, PwC focuses its discussion of these issues on Plaintiffs' new arguments.[22]

### A. The PwC Policies And Practices That Plaintiffs Identify Are Lawful And Non-Discriminatory.

Plaintiffs' renewed motion raises only one new argument regarding PwC's policies and practices: Plaintiffs claim, remarkably, that PwC discriminates against older workers by promoting from within and helping its own Associates "progress to the Experienced and Senior Associate positions." (Renewed Mot. at 5-6). Virtually every employer—for sound, common-sense business reasons having nothing to do with age—seeks to retain and promote its existing employees. There is nothing unlawful about doing so. Tellingly, Plaintiffs cite no case suggesting otherwise.[23]

The remaining arguments in Plaintiffs' renewed motion identify the same formal, uniform PwC policies as in their original motion, again alleging that PwC has a standardized hiring and interview process, and that PwC recruits for entry-level positions largely on college campuses. (*See* Orig. Mot. at 6, 10-11; Renewed Mot. at 4). The existence of formal nationwide recruiting or hiring policies, however, is in no way unlawful; these are standard at national businesses to ensure a consistent approach to hiring. For an express nationwide policy to support an ADEA claim, it must be discriminatory; PwC's policies are not. To the contrary, "[t]he firm's policies require PwC to provide

---

[22] Plaintiffs argue that the Court's prior ruling that Plaintiffs had "adequately shown a uniform decision, policy, or plan on the basis of PwC's centralized and uniform hiring policies, and the substantial evidence of age disparities in hiring" is the law of the case. *See Rabin I*, 2018 WL 3585143, at *4. This is not candid. The law of the case doctrine is "wholly inapposite" to the circumstances here, as "[t]he doctrine simply does not impinge upon a district court's power to reconsider its own interlocutory order provided that the court has not been divested of jurisdiction." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001). Also, the law of the case doctrine "is discretionary, not mandatory, and is in no way a limit on the court's power." *Id.* at 888 (internal quotations omitted).

[23] Plaintiffs also claim that PwC mandates posting Experienced-track jobs internally before opening them to the public. (Renewed Mot. at 6). The documents Plaintiffs cite, however, reflect no such policy. Pl. Ex. 48 states only that there exists an internal "gateway" for current PwC employees, but says nothing about any requirement that jobs be posted there first, to the exclusion of posting externally. Similarly, Pl. Ex. 49 simply states that new Requisitions are posted to the internal gateway "for the period specified by the respective LOS HR Leader." (*See id.* at PWC_00006785).

equal employment opportunities to all individuals seeking employment, using impartial and lawful hiring techniques," and "[h]iring decisions cannot be based on a candidate's inclusion in a class protected by law and/or firm policy." (Pl. Ex. 39 at PWC_00005219-21).[24]

**B.    Plaintiffs "Evidence" Of Ageist Bias Is Mischaracterized, Misinterpreted, Or Reflects Unique, Isolated Incidents.**

Plaintiffs claim that their allegations about uniform ageist policies at PwC are supported by "newly discovered evidence." (Renewed Mot. at 11) But the only new "evidence" of alleged bias in the renewed motion consists of a handful of documents in which PwC personnel noted that certain candidates were overly experienced for particular roles. (Renewed Mot. at 7, fn. 38).  The balance of Plaintiffs' purported "evidence" of institutional age bias consists of the misconstrued citations used in their original certification motion. (Orig. Mot. at 5-7; Renewed Mot. at 5-8; *contra* Orig. PwC Resp. at 5-8).

**1.    Rejecting Applicants With Too Much Experience Is Lawful, And Plaintiffs Rely On Misstated "Evidence" To Suggest Otherwise.**

Plaintiffs only point to one new spreadsheet and five new emails in which PwC personnel noted that certain candidates were too experienced for particular roles, to distinguish their renewed motion from their original motion. (*See* Pl. Ex. 52; Pl. Exs. 63-67).  These documents fail to show even individual instances of bias—much less a company-wide discriminatory scheme—because rejecting

---

[24]   Notably, Plaintiffs identify only one other nationwide policy that they contend is discriminatory: PwC's recruiting on college campuses.  As evidence that campus recruiting harms older applicants, Plaintiffs point to two Associate Requisitions that list a "Graduation End Date." (Renewed Mot. at 5).  As PwC explained in its Interrogatory responses, Source1 does not contain any fields that limit the ability of applicants to submit applications based on the date of graduation, and "Graduation End Date" terms were previously included only in some requisitions, consistent with parameters set by individual universities' career services centers.  (Ex. F, PwC's Responses to Plaintiffs' First Set of Interrogatories, at 3-4).  PwC addressed the balance of Plaintiffs arguments regarding campus recruiting in its original response.  (*See* Orig. PwC Resp. at 2 - 5).

overqualified employees is entirely lawful, and the documents Plaintiffs cite give no indication that PwC employees ever used "too experienced" as code for an applicant's age.

First, courts routinely hold that rejecting employees as having "too much" experience does not violate the ADEA, because there are legitimate, non-discriminatory reasons an employer may be wary about hiring workers overqualified for a particular role.[25]  Second, Plaintiffs point to no evidence that PwC had a policy of using "too much experience" to weed out over-40 applicants, or that it had any such effect.  Most of the documents Plaintiffs cite contain no indication of the applicant's age, let alone that the applicant was 40 or older.  And these documents make clear that the comment is actually directed, with specificity, to the extent of the applicant's experience, not her age.[26]  In two of the new exhibits, for example, PwC employees suggest that a given candidate has too much experience for one position but may be suited for a *more senior* job with the company.  (*See* Pl. Ex. 63 (suggesting that applicant "may be more of a Manager than a Senior [Associate]" based on his extensive experience);

---

[25] *See, e.g.*, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1290 (9th Cir. 2000) (affirming summary judgment for employer, because "an employer may choose not to hire an employee because he is overqualified for a position without violating ADEA"); *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 118 (2d Cir. 1991) (holding that ADEA does not "forbid[] employers from declining to place employees in positions for which they are overqualified on the ground that overqualification may affect performance negatively."); *Stein v. Nat'l City Bank*, 942 F.2d 1062, 1065–66 (6th Cir. 1991) (noting that avoiding hiring overqualified applicants furthers an employer's non-discriminatory interests "by preventing the employment of individuals who will become bored quickly because of their level of qualification; and by not hiring those individuals who are capable of obtaining other, perhaps better paying, jobs shortly after employment."); *Jianqing Wu v. Special Counsel, Inc.*, 54 F. Supp. 3d 48, 55 (D.D.C. 2014), *aff'd*, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015) (holding that "ADEA does not forbid the practice" of rejecting applicants for having too much experience, because "age and experience in the field are not logical equivalents for the purpose of the ADEA… a candidate over 40 will not necessarily be the more experienced candidate").  While some courts have expressed concern that in some instances "too much experience" may be code for an applicant's age, Plaintiffs point to no evidence that such is the case here.

[26] As Plaintiffs admit, the Covered Positions are essentially "entry-level" or nearly entry-level jobs.  (*See* Feb. 27, 2018 Hr'g Tr. at 76:25-77:1).  That a PwC recruiter expressed concern about hiring for a relatively junior position someone with "over 20 years" of experience in the pension industry, a J.D., and a Master's degree in no way evidences any company-wide bias against older applicants.  (*See* Pl. Ex. 66).

Pl. Ex. 64 (PwC employee suggesting applicant's "experience/salary would possibly be better for a higher level")).

### 2. Plaintiffs Fail To Establish That PwC Fosters A Culture Of Age Bias.

Plaintiffs again assert that PwC has a "culture" of preferring Millennials over other generations of workers, reusing the same documents they cited in their original motion.  (Orig. Mot. at 5-6; Renewed Mot. at 6).  As PwC previously addressed in its opposition brief, Plaintiffs mischaracterize these documents.  (*See* Orig. PwC Resp. at 5-10).  Without any evidentiary support, Plaintiffs' vague, general allegations of discrimination do not identify a uniform decision, policy, or plan.  *See Roberts v. Target Corp.*, 2013 WL 5256867, at *3 (W.D. Okla. Sept. 17, 2013) (denying conditional certification because "amorphous allegations" regarding a "strategic plan by Target to ensure they were employing a younger demographic" do not "point to any single nationwide plan or policy").

### 3. Plaintiffs' Allegations That PwC Stigmatizes Older Applicants Are Based On Misstated "Evidence" Or Isolated Incidents.

Plaintiffs point again to the same handful of comments by PwC personnel that Plaintiffs identified in their original briefing as allegedly stigmatizing or disfavoring older applicants by using terms like "non-traditional" or "fit."  (Orig. Mot. at 7; Renewed Mot. at 7).  Again, Plaintiffs misstate what most of the documents actually say.  (*See* Orig. PwC Resp. at 7-8).  Even if all the comments Plaintiffs complain about were actually made ***and*** mean what Plaintiffs interpret them to mean, a handful of comments from among tens of thousands of PwC job interviews does not establish a company-wide policy of discrimination.  *See Gessele*, 2013 WL 1326563, at *28 (denying conditional certification where plaintiff had shown only "decentralized and independent misconduct by some supervisors" rather than a company-wide policy); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 347 (W.D.N.Y. 2011) (denying conditional certification because plaintiffs had shown only that certain rogue managers misapplied the employer's written hours allocation policy).

C.     **Dr. Neumark's Aggregate Counts Are Not Evidence Of A Single Discriminatory Policy**.

Plaintiffs argue that both the original statistical analyses by their expert, Dr. Neumark, and a supplemental report offered with their renewed motion show "that older applicants are disfavored at each step of PwC's hiring process." (Renewed Mot. at 8). As explained above, none of Dr. Neumark's reports provides evidence of discrimination in PwC's hiring process, let alone that older job applicants are together the victims of a single discriminatory policy.[27] Thus, Dr. Neumark's reports do nothing to satisfy Plaintiffs' burden to show a discriminatory policy affecting the putative collective.[28]

## III.    PLAINTIFFS' NOTICE PROPOSAL IS PREMATURE AND INAPPROPRIATE.

Finalizing a notice is premature before knowing the scope of the collective, if any. Instead, as is common practice, the parties should be directed to meet and confer promptly "regarding the form and content of the proposed notice," if any collective is conditionally certified. *See e.g., Kress v. PricewaterhouseCoopers LLP*, 263 F.R.D. 623, 631 (E.D. Cal. 2009) (granting parties 45 days to meet and confer and submit a joint proposal for notice); *Alvarez v. Farmers Ins. Exch.,* 2014 WL 4685031, at *4 (N.D. Cal. Sept. 19, 2014) (directing the parties to meet and confer regarding the form and content of notice); *see also Heath,* 215 F. Supp. 3d at 857 (same); *Margulies v. Tri-Cty. Metro. Transp. Dist. of Oregon,* 2013 WL 5593040, at *19 (D. Or. Oct. 10, 2013) (same); *Sanchez v. Sephora USA, Inc.,* 2012 WL 2945753, at *6 (N.D. Cal. July 18, 2012) (same).

Even if the Court were to consider Plaintiffs' current proposed notice, it omits critical information. For example, the notice should disclose to potential opt-ins that they may be required to

---

[27] *See* pp. 13-15, *supra*. Dr. Neumark admitted under oath that his original findings are "documenting age differences, and that's all," and that his analysis does not even attempt to distinguish between discrimination or "non-discriminatory factors that correlate with age." (Def. Ex. A, Neumark Tr. at 64:4-11; 67:11-17). Because his analysis made no attempt to control for any other possible differences between older and younger pools of applicants (*id*. at 153:21-154:7), Dr. Neumark admits that no academic journal would accept his findings for publication. (*Id*. at 130:14-131:1). Without such controlling variables, there is no way to draw an inference of discrimination from Dr. Neumark's findings. His Supplemental Reports simply count the number of applicants who pass the initial screen—with no controls for qualifications or other explanatory variables—and do not purport to provide evidence of discrimination in PwC's initial screen. (Pl. Ex. 33).

[28] *See* note 19, *supra*.

participate actively in the lawsuit, including by producing relevant documents, responding to written

discovery requests, and providing testimony under oath at deposition or trial.  *See Heath v. Google

Inc.*, 5:15-cv-01824-BLF, ECF No. 125-1 at p. 3, Dec. 6, 2016 (N.D. Cal.) (approving notice

containing language telling opt-in plaintiffs that they may be required to actively participate in

discovery); *Saravia v. Dynamex, Inc*., 310 F.R.D. 412, 426 (N.D. Cal. 2015) (narrowing scope of

plaintiff's proposed collective and ordering notice to inform opt-ins that they may "be required to

submit evidence or provide testimony during the case"); *Walton v. AT&T Servs., Inc.,* No 15-cv-3653-

VC, ECF No. 107 at *3 (N.D. Cal. Sept. 15, 2014) ("The notice shall inform the proposed class

members that they 'might be required to provide information' relevant to the lawsuit if they join it.");

*Adams v. Inter-Con Sec. Sys., Inc.,* 242 F.R.D. 530, 541 (N.D. Cal. 2007) (same).

     The notice should also disclose to potential plaintiffs that they may be required to pay a portion

of PwC's costs if PwC prevails.  *See Heath v. Google Inc.*, 5:15-cv-01824-BLF, ECF No. 125-1 at p.

3, Dec. 6, 2016 (N.D. Cal.) (approving notice containing language telling opt-in plaintiffs that they

may be required to pay a portion of the defendant's costs if it prevails).[29]

     In addition, Plaintiffs seek an excessive notice period of 90 days.  While some courts have

ordered a 90-day period, the standard in the Ninth Circuit ranges from 60 to 90 days, with courts in

this district routinely ordering a 60-day period.  *See, e.g., Sephora USA, Inc*., 2012 WL 2945753, at

---

[29] *See Landry v. Swire Oilfield Servs. LLC,* 252 F.Supp.3d 1079, 1128 (D.N.M 2017) (ordering that the notice must warn plaintiffs about potential costs and noting, "[m]ore recently … courts have required such warnings, reasoning that, because some courts *have* awarded costs to prevailing defendants in FLSA cases, such an award is clearly possible and is not merely theoretical.") (internal citations and quotations omitted); *Creten-Miller v. Westlake Hardware, Inc.*, 2009 WL 2058734, at *4 (D. Kan. July 15, 2009) (ordering that the notice disclose potential costs to plaintiffs, explaining, "[C]ourts have awarded costs to prevailing defendants in FLSA cases" and citing *Johnson v. Big Lots Stores, Inc.,* 2009 WL 1870862, at *9–10 (E.D. La. June 25, 2009) (awarding costs related to claims of 43 individual participants who moved to dismiss their claims)); *Gomez v. Reinke,* 2008 WL 3200794, at *6 (D. Idaho Aug. 7, 2008) (awarding costs to defendants for prevailing on merits); *Reyes v. Tex. Ezpawn, L.P.,* 2007 WL 4530533, at *2 (S.D. Tex. Dec.19, 2007) (awarding costs to defendant as prevailing party); *Baltazar v. US Airways Grp., Inc.*, 2013 WL 4654567, at *9 (D. Ariz. Aug. 30, 2013) (ordering that "the notice must be amended to advise potential opt-in plaintiffs that they may be liable for costs and attorney's fees if Defendant prevails"); *Sephora USA, Inc.,* 2012 WL 2945753, at *7  (ordering parties to meet and confer "to draft a mutually acceptable provision explaining potential costs that Plaintiffs may incur"); *Stanfield v. First NLC Fin. Servs., LLC,* 2006 WL 3190527, at *5 (N.D. Cal. Nov.1, 2006) (holding that "potential Plaintiffs should be made aware of any fees or costs for which they may be liable before opting in to the lawsuit").

*6 (rejecting plaintiff's request for 90 days and finding a "period of sixty days [is] sufficient"); *Luque v. AT & T Corp.*, 2010 WL 4807088, at *7 (N.D. Cal. Nov. 19, 2010) (60-day opt-in period); *Stanfield*, 2006 WL 3190527, at *6 (same); *Baltazar*, 2013 WL 4654567, at *9 (ordering 60-day opt-in period); *Saravia*, 310 F.R.D. at 426 (same); *Villarreal v. Caremark LLC*, 66 F. Supp. 3d 1184, 1195 (D. Ariz. 2014) ("60 days is a sufficient opt-in period"). A shorter notice period is especially warranted here as Plaintiffs' counsel have publicized and advertised this lawsuit for more than two years. Although there has been no court-authorized notice of any collective action, Plaintiffs' counsel has continuously publicized this lawsuit through articles and on their website (https://www.pwcagecase.com/). Plaintiffs have also been directly contacting putative collective members at least since PwC produced email, telephone, and mailing information for all potential collective members in August 2017. Given the amount of time Plaintiffs have already been pursuing potential collective members, a 60-day formal notice period would keep the lawsuit moving, while affording potential collective members sufficient time to opt in.

1

DATED:  September 10, 2018

Respectfully submitted,
KIRKLAND & ELLIS LLP

2

3

*/s/ Emily Nicklin*

Michael P. Esser (SBN 268634)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: michael.esser@kirkland.com

4

5

6

7

Emily Nicklin (pro hac vice)
Gabor Balassa (pro hac vice)
Christina Briesacher (pro hac vice)
Mark Premo-Hopkins (pro hac vice)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: emily.nicklin@kirkland.com
        gabor.balassa@kirkland.com
        christina.briesacher@kirkland.com
        mark.premohopkins@kirkland.com

8

9

10

11

12

13

14

Attorneys for Defendant
*PricewaterhouseCoopers LLP*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

On September 10, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all persons registered for ECF.

*/s/ Emily Nicklin* _____