UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE RABIN, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>   Defendant. | Case No. 16-cv-02276-JST<br><br>**ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT AND GRANTING IN PART MOTION FOR ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS**<br><br>Re: ECF Nos. 326, 334 |

  Before the Court are Plaintiffs' unopposed motion for an award of attorney's fees, costs, and service awards, ECF No. 326, and unopposed motion for final settlement approval, ECF No. 334. The Court will grant the motion for final approval, and will grant in part the motion for fees, costs and service awards.

**I. BACKGROUND**

 **A. Parties and Claims**

  Defendant PricewaterhouseCoopers, LLC ("PwC") is a global accounting and auditing firm. ECF No. 42 ¶ 2. Plaintiff Steve Rabin is a Certified Public Accountant who applied for a Seasoned Experienced Associate position with PwC when he was 50 years old. *Id.* ¶¶ 25-26. Plaintiff John Chapman "has a master's degree in accounting with ten years of experience in bookkeeping" and applied for a Tax Transfer Pricing Associate position with PwC when he was 47 years old. *Id.* ¶¶ 27-28. PwC rejected Rabin's and Chapman's applications for employment. *Id.* ¶¶ 26, 28. Both men allege that PwC denied them employment because of their age. *Id.* ¶¶ 72, 81.

  Plaintiffs bring this putative class and collective action on behalf of individuals 40 years of age or older who applied for and were denied positions as full-time Associates, Experienced

Associates, or Senior Associates (the "Covered Positions") in PwC's Tax and Assurance lines of service. ECF No. 312-2 §§ 1.3, 1.13, 1.28, 1.43. In the operative first amended complaint ("FAC"), Plaintiffs allege that PwC "maintains hiring policies and practices for giving preference to younger employees that result in the disproportionate employment of younger applicants." ECF No. 42 ¶ 6. In particular, Plaintiffs allege that PwC discriminates against older job applicants by willfully "utilizing a biased recruiting system for entry-level accounting hiring," and "refusing to hire applicants ages 40 and over for the Covered Positions." *Id.* ¶ 54. The FAC asserts seven causes of action: (1) intentional discrimination in violation of the federal Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1); (2) disparate impact discrimination in violation of the ADEA, 29 U.S.C. § 623(a)(2); (3) intentional discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940(a); (4) disparate impact discrimination in violation of FEHA, Cal. Gov. Code §§ 12940(a), 12491; (5) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (6) intentional discrimination in violation of the Elliott-Larsen Civil Rights Act ("MCRA"), Mich. Comp. Laws § 37.2202(a); and (7) disparate impact discrimination in violation of MCRA, Mich. Comp. Laws § 37.2202(b). *Id.* ¶¶ 1, 82-135.

### B. Procedural History

On April 27, 2016, Rabin filed the original complaint on behalf of a nationwide ADEA collective and a California class. ECF No. 1 ¶¶ 47, 53. On September 8, 2016, Chapman joined as a plaintiff asserting claims on behalf of a Michigan class. ECF No. 42 ¶ 58. PwC moved for judgment on the pleadings on December 1, 2016, arguing that the ADEA does not permit job applicants to bring disparate impact claims. ECF No. 55 at 7-11. The Court denied PwC's motion. ECF No. 74 at 10.

After denying Plaintiffs' first motion for conditional certification of their proposed collective action, ECF No. 236, the Court granted Plaintiffs' renewed motion for collective certification of a nationwide ADEA collective on March 28, 2019. ECF No. 274 at 7. Subsequently, of the approximately 17,000 potential members who received notice, 3,456 individuals opted in to the Collective. ECF No. 312-1 ¶ 21.

On September 21, 2018, Plaintiffs and PwC (the "Parties") attended a full-day mediation overseen by Robert Meyer of JAMS. *Id.* ¶ 22. After several additional months of negotiation, the Parties reached a tentative agreement regarding programmatic relief. *Id.* ¶ 23. On January 21, 2020, in a second full-day mediation overseen by David A. Rotman, the Parties reached an agreement on a monetary settlement amount. *Id.* ¶¶ 25-26. On March 3, 2020, Plaintiffs filed a motion for preliminary approval of the class and collective action settlement agreement. ECF No. 312. On August 19, 2020, the Court granted preliminary approval but required revisions to the proposed notices. ECF No. 316. On December 8, 2020, Plaintiffs filed a motion for award of attorney's fees, costs, and service awards. ECF No. 326. On January 13, 2021, Plaintiffs filed an unopposed motion for final approval of settlement. ECF No. 334. The Court held a final approval hearing on January 27, 2021.

### C. Terms of Settlement

The proposed settlement agreement ("Settlement") resolves claims between PwC and a national ADEA collective, a California class, and a Michigan class (collectively, the "Settlement Class"). The ADEA Settlement Collective ("Collective"), which the Court conditionally certified on March 28, 2019, includes:

> all the applicants (a) who applied to and were denied Covered Positions on or after October 18, 2013, (b) who were aged 40 or older at the time of application, and (c) who opted in to this Litigation pursuant to the federal Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, et seq. ("ADEA") on or before January 21, 2020.

ECF No. 312-2 § 1.43. The classes to be certified under Rule 23 include:

> "California Class" means all applicants who, between September 8, 2013 and January 21, 2020 (inclusive), (a) applied for and were denied a Covered Position in California or (b) resided in California at the time they applied to a Covered Position and were denied; and were aged 40 or older at the time of application.

> "Michigan Class" means all applicants who, between September 8, 2013 and January 21, 2020 (inclusive), (a) applied for and were denied a Covered Position in Michigan or (b) resided in Michigan at the time they applied to a Covered Position and were denied; and were aged 40 or older at the time of application.

*Id.* §§ 1.28, 1.3. The proposed California and Michigan classes are "substantially the same" as

3

were proposed in the FAC."[1]  ECF No. 312 at 24 n.14; *see* ECF No. 42 ¶¶ 57-58.

To compensate collective members and class members who file claim forms ("Claimants"), the Settlement provides a common fund of $11,625,000.00 (the "Gross Fund"). ECF No. 312-2 §§ 1.25, 4.1.  The Gross Fund includes the individual payments to participating class and collective members, service awards to the named plaintiffs and declarants, attorney's fees and costs, and administrative costs.  ECF No. 334.  Plaintiffs propose the following amounts will be deducted from the common fund: (1) $4,068,750 in attorney's fees; (2) $270,323.63 in costs to class counsel; (2) service awards of $20,000 for each of the two named plaintiffs, plus $2,000 for each of the 24 declarants; (3) $140,501 in settlement administration costs; (4) up to $20,000 for an implementation expert to advise on programmatic relief; and (5) a $300,000 reserve fund for collective members and class members who file forms "for any alleged and valid age discrimination claims based on PwC's failure to hire them into a Covered Position" during a 15-month window following the date of the Settlement's final approval.  ECF No. 312-2 §§ 1.39, 4.2, 5.1, 6.1, 10.1; *see also* ECF No. 312 at 16.  The remaining funds after the deductions (the "Net Fund") will then be distributed to individual claimants.  ECF No. 312-2 §§ 1.31, 4.2.7, 4.3.  Individual awards will be calculated using a point system that accounts for claimants' settlement class and their qualifications to work at PwC.  *Id.*; *see* ECF No. 312 at 17.  Any remaining funds will be redistributed to claimants pro rata or given as a *cy pres* donation to Experience Works, Inc., "a nationwide nonprofit dedicated to helping people age with dignity and purpose and improve quality of life through training, community service, and employment."  ECF No. 312 at 18; ECF No. 312-2 § 10.4.

In addition to monetary relief, the Settlement includes programmatic relief for a period of two years to "enhance [PwC's] recruiting and hiring process for Older workers who may wish to apply for Covered Positions in the future."  ECF No. 312 at 16; *see also* ECF No. 312-2 § 3.  Key

---

[1] Consistent with the Court's order denying conditional certification of an ADEA collective that included unqualified and deterred applicants, ECF No. 103, the Rule 23 classes have been amended to exclude unqualified and deterred applicants. ECF No. 312 at 24 n.14.  In addition, under the Settlement, the parties have agreed that the California and Michigan classes reach back three years from the date of the operative complaint instead of four years, as was set forth in the FAC.  ECF Nos. 42, 314 at 24 n.14.

features of the programmatic relief include PwC's agreement to (1) hire an implementation expert to advise on training and recruitment matters; (2) advertise directly to older applicants; (3) refrain from asking pre-offer applicants their graduation date; (4) include age as an aspect of PwC's nondiscrimination policy; (5) permit alumni to apply for on-campus openings of Covered Positions; and (6) institute an age discrimination complaint procedure.  ECF No. 312-2 §§ 3.2-3.3.

In exchange, participating class and collective members will waive the following claims:

> [A]ny claims against the Released Parties up until January 21, 2020, including but not limited to all known and unknown claims, promises, causes of action, or similar rights of any kind that they presently have or may have for discrimination because of age arising out of or relating in any way to any of the legal, factual, or other allegations made in the Litigation, or any legal theories that could have been raised based on the allegations in the First Amended Complaint, including, without limitation, claims under the Age Discrimination in Employment Act of 1967 ("ADEA") or parallel state or local laws except that Participating Class Members who are not Participating Collective Members and do not submit Claim Forms will not release ADEA claims, since they have not opted into the ADEA Collective (the "Released Claims").

*Id.* § 12.1.  In addition, the named plaintiffs and any declarants who receive a service award will execute a general release of all claims.  *Id.* § 12.3; *see also* ECF No. 312-2 at 55-61.

## II.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## III.   FINAL APPROVAL OF SETTLEMENT

### A.    Legal Standard

"The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998).  In addition, Rule 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* at 1026.  Under Ninth Circuit precedent, the district court must balance several factors in this analysis:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7)

5

the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). As there is no governmental participant in this case, the Court does not consider that factor.[2]

Settlements that occur before formal class certification also "require a higher standard of fairness." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000). In reviewing such settlements, in additional to considering the above factors, the court also must ensure that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal quotation marks, alteration, and citation omitted).

"Rule 23 actions are fundamentally different from collective actions under the FLSA." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) (citing *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 177-78 (1989)). While Rule 23 expressly requires that courts review settlement agreements that bind class members for fairness, reasonableness, and adequacy, the FLSA has no such statutory requirement. *Flores v. TFI Int'l Inc.*, No. 12-cv-05790-JST, 2019 WL 1715180, at *6 (N.D. Cal. Apr. 17, 2019); *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1099 (9th Cir. 2018) (explaining the ADEA incorporates enforcement provisions of the FLSA and shall be enforced using certain powers, remedies, and procedures of the FLSA). However, "courts in this district and this circuit have followed the Eleventh Circuit's holding that FLSA collective action settlements require the supervision of either the Secretary of Labor or the district court." *Flores*, 2019 WL 1715180, at *6 (collecting cases). The Eleventh Circuit's standard requires the settlement to constitute "a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982).

---

[2] The 2018 amendments to Rule 23 require the district to court to consider a similar list of factors, including the adequacy of representation by class representatives and class counsel, whether the proposal was negotiated as arm's length, and the adequacy of the relief and equitable treatment of class members. Fed. R. Civ. P. 23(e)(2). These factors were "not designed 'to displace any factor [developed under existing circuits' precedent], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'" *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 6619983, at *4 (N.D. Cal. Dec. 18, 2018) (quoting Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment).

### B. CAFA Compliance

This action is subject to the requirements of the Class Action Fairness Act of 2005 ("CAFA") which requires, that, within ten days of the filing of a proposed settlement, each defendant serve a notice containing certain required information upon the appropriate State and Federal officials. 28 U.S.C. § 1715(b). CAFA also prohibits a court from granting final approval until ninety days have elapsed since notice was served under § 1715(b). *Id.* § 1715(d). The Parties mailed the CAFA notices on March 13, 2020. ECF No. 334 at 18; ECF No. 334-3 at 4.

### C. Discussion

For the reasons that follow, the Court will grant final approval of the settlement.

#### 1. Adequacy of Notice

A court must "direct notice [of a proposed class settlement] in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). The parties must provide class members with "the best notice that is practicable under the circumstances, including individual notices to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). "[T]he class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982).

During its review of the motion for preliminary approval, the Court directed Plaintiffs to correct several deficiencies in the proposed notices. ECF No. 316 at 21. Specifically, the Court noted that the procedures for objecting and opting out of the settlement did not conform to the Northern District Guidance. *Id.* at 20. Plaintiffs submitted corrected notices which indicate that class members wishing to opt out of the settlement need only provide the class member's name, and a statement that the class member wishes to be excluded from the settlement class. ECF No. 319 at 3. Following the Court's approval of these revised notices, ECF No. 319, JND Legal, the settlement administrator, carried out the notice procedures as directed by the preliminary approval order. ECF No. 334 at 16. Notices were mailed to a total of 10,626 class and collective members, comprising 3,456 ADEA opt-ins and 7,170 California and Michigan individuals. *Id.* at 13. These notices were successfully delivered to all but 439 individuals, or 4.1% of the total class and

collective members. ECF No. 334-3 at 5. JND Legal also created a website and a toll-free number. *Id.* at 3-4. Ultimately, JND Legal received 3,329 claim forms, representing 31% of class and collective members. *Id.* at 6. As confirmed by Plaintiffs at the final approval hearing, ADEA collective members were asked to submit claim forms in order to determine eligibility and gather information necessary for settlement allocation. *Cf. Flores*, 2019 WL 1715180 at *8 (explaining that in an FLSA or ADEA collective action, "once a plaintiff has opted in, no further action by him or her is required to receive the benefit of any settlement"); *Campbell*, 903 F.3d at 1104 (an opt-in collective member's action is "deemed 'commenced' from the date her opt-in form is filed with the district court").

The Court finds that the Parties and the settlement administrator have successfully executed the notice plan and that they have provided adequate notice to class and collective members.

### 2. Fairness, Adequacy, and Reasonableness

During the preliminary approval stage, the Court found that the strength of Plaintiffs' case, risks of litigation, expense, complexity, and likely duration of further litigation weighed in favor of preliminary approval. ECF No. 316 at 12. The Court also found that the proposed settlement amount was adequate, that the resolution was non-collusive, and that the extent of discovery and experience of Plaintiffs' counsel weighed in favor of approval. *Id.* at 13-15. The Court finds no reason to alter these conclusions now that class and collective members have received notice and an opportunity to be heard.

First, Plaintiffs contend that the risks of further litigation support final approval. ECF No. 334 at 20. Should litigation continue, Plaintiffs would be required to demonstrate statistically significant disparities by age in hiring, certify a class and avoid decertification, prevail at trial, and survive any potential appeals. *Id.* Plaintiffs note that if they were to prevail at trial and the Ninth Circuit were to affirm, such a decision would create a circuit split on the issue of whether the ADEA allows disparate impact claims by job applicants, opening the door to further appeals. *Id.* at 21 (identifying cases in the Seventh and Eleventh Circuits holding that job applicants are not covered under the ADEA's disparate impact provision). The Court agrees that these risks

continue to weigh in favor of settlement.

Second, Plaintiffs contend that the settlement amount is reasonable. ECF No. 316 at 13-15. Class members will receive awards ranging from $200 to approximately $6,054, with an average award of approximately $2,054. ECF No. 334 at 22. In addition, the programmatic relief requires PwC to make changes in its hiring practices to attract and hire older workers. *Id.* at 23. Globally, Plaintiffs estimate that, with a 12.5% chance of recovering the maximum damages, the expected value of the case is $9.2 million, which is less than the Settlement. ECF No. 312 at 31. The parties engaged in multiple years of extensive discovery requiring production and review of over a million pages of documents; engaged in numerous discovery disputes; and reviewed voluminous applicant data requiring the use of specialized software. ECF No. 316 at 13-14; ECF No. 326 at 12-14; ECF No. 334 at 11, 25. The discovery process has permitted the Parties to collect "sufficient information to make an informed decision about the Settlement." *In re Mego*, 213 F.3d at 459.

Further, the settlement was reached after the Parties engaged in motion practice and participated in two arms-length settlement negotiations overseen by experienced and neutral mediators. ECF No. 316 at 14. *See* Advisory Committee Notes, Fed. R. Civ. P. 23, subdiv. (e)(2) (2018) ("[T]he involvement of a neutral . . . mediator or facilitator in [] negotiations may bear on whether they were conducted in a manner that would protect ad further the class interests."); *Satchell v. Fed. Exp. Corp.*, No. C 03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement confirms that the settlement is non-collusive."). The settlement contains neither a "clear sailing provision" nor a reversionary arrangement, and attorney's fees are reasonable as discussed below, which further supports a finding of non-collusion. *See In re Bluetooth*, 654 F.3d at 947 (finding a reasonable and fair settlement where the attorney's fee is not disproportionate, no clear sailing provision, and no reversion of fees to defendant). Plaintiffs' Counsel recommend final approval of the settlement.[3]

---

[3] The Court considers this factor, as it must, but gives it little weight. "Although a court might give weight to the fact that counsel for the class or the defendant favors the settlement, the court should keep in mind that the lawyers who negotiated the settlement will rarely offer anything less

1 Lastly, the overall reaction of the class was positive. Approximately 31% of notice recipients submitted claim forms. ECF No. 334 at 25. Eleven class and collective members, or 0.1%, submitted requests for exclusion from the Settlement and two individuals objected. *Id.* at 5. The first objection, which was later withdrawn, questioned why subsequent applications to non-Covered Positions were not included in the Settlement. *Id.* at 17. Plaintiffs' counsel explained to this objector that the Settlement focuses only on Covered Positions and that participation in the Settlement would not affect claims of discrimination arising out of applications to other positions. *Id.* The second objection challenged the settlement allocation structure, which applies a higher multiplier for an individual whose application was rejected after an in-person interview than an individual whose application was rejected without an interview. *Id.*; *see also* ECF Nos. 324, 333. This objector argued that individuals rejected without an in-person interview experienced greater discrimination because they were denied an opportunity to interview. ECF No. 334 at 17. However, the ADEA requires that claimants meet the minimum qualifications of the job, which those individuals who were invited for an in-person interview are more likely to possess. *Id.*; *see also Heath v. Google Inc.*, 215 F. Supp. 3d 844, 855 (N.D. Cal. 2016) (limiting class alleging violation of ADEA to engineers who received an in-person interview with Google). This Court has already emphasized the importance of ensuring that the allocation structure accounts for the minimum qualification threshold. *See* ECF No. 236 at 9-11. Therefore, while acknowledging the objector's concerns, the Court nonetheless finds the settlement to be reasonable given the challenge of fairly accounting for the disparate claims of class and collective members.

### 3. Bona Fide Dispute

"A bona fide dispute exists when there are legitimate questions about the existence and extent of the defendant's FLSA liability." *Jennings v. Open Door Mktg., LLC*, No. 15-cv-4080-KAW, 2018 WL 4773057, at *4 (N.D. Cal. Oct. 3, 2018) (quoting *Gonzalez v. Fallanghina, LLC*, No. 16-cv-01832-MEJ, 2017 WL 1374582, at *2 (N.D. Cal. Apr. 17, 2017)). Thus, "there must be some doubt whether Plaintiffs will be able to succeed on the merits of their FLSA claims." *Heath*

---

than a strong, favorable endorsement." *Principles of the Law of Aggregate Litigation* § 3.05 cmt. a (2010).

10

*v. Google LLC*, No. 15-cv-01824-BLF, 2019 WL 3842075, at *4 (N.D. Cal. Aug. 15, 2019).

The Court finds there to be a bona fide dispute. In earlier motion practice, the Parties disputed whether Plaintiffs could present adequate evidence of a company-wide policy or practice, and whether the proposed definition of the collective was sufficiently narrow to limit notice to similarly situated individuals or was otherwise unworkable. ECF No. 274 at 7-8. Additionally, even though Plaintiffs successfully argued that the ADEA allows disparate impact claims by job applicants, Plaintiffs note that the Seventh and Eleventh Circuits hold otherwise, presenting a potential appellate dispute. *See* ECF No. 334 at 21; *see also Kleber v. CareFusion Corp.*, 914 F.3d 480 (7th Cir.) (en banc) *cert. denied*, 140 S. Ct. 306 (2019) (job applicants not covered under ADEA disparate impact provision); *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (11th Cir. 2016) (en banc) (same). There was and continues to be a bona fide dispute in this case.

After reviewing all the required factors, the Court continues to find the settlement fair, reasonable, and adequate, and that certification of the settlement class is appropriate. The Court concludes that the settlement meets the requirements of CAFA and resolves a bona fide dispute under the FLSA. Accordingly, Plaintiffs' motion for final approval of the Settlement is granted.

## IV.   ATTORNEY'S FEES, COSTS, AND INCENTIVE AWARDS

### A.   Attorney's Fees

#### 1.   Legal Standard

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' argument, . . . courts have an independent obligation to ensure that the award, like the settlement itself is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941 (internal citation omitted). "Where a settlement produces a common fund for the benefit of the entire class," as here, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method" to assess the reasonableness of the requested attorney's fee award. *Id.* at 942. "Because the benefit to the class is easily quantified in common-fund settlements," the Ninth Circuit permits district courts "to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.*

11

The Ninth Circuit maintains a well-established "benchmark for an attorneys' fee award in a successful class action [as] twenty-five percent of the entire common fund." *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997). Courts in the Ninth Circuit generally start with the 25% benchmark and adjust upward or downward depending on:

> the extent to which class counsel "achieved exceptional results for the class," whether the case was risky for class counsel, whether counsel's performance "generated benefits beyond the cash settlement fund," the market rate for the particular field of law (in some circumstances), the burdens class counsel experience while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-55 (9th Cir. 2015) (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002)). Beyond this analysis, courts often crosscheck the amount of fees against the lodestar. "Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050. "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. Regardless of whether the court uses the lodestar or percentage approach, the main inquiry is whether the fee award is "reasonable in relation to what the plaintiffs recovered." *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000).

### 2. Discussion

The Gross Fund totals $11,625,000. ECF No. 326 at 10. Plaintiffs seek an attorney's fee award of 35%, or $4,068,750, of the Fund, which is 40% greater ($1,162,500) than the Ninth Circuit's standard benchmark. *Id.* Plaintiffs argue that their requested fee award is appropriate under either the percentage of recovery or the lodestar method of review. *Id.* at 18-19, 26. They contend that their request under the percentage method aligns with comparable awards in the District and in the Circuit, and that a 35% award is with the range of reasonableness when considering the Ninth Circuit's benchmark of 25% in "megafund" ($50 million to $200 million) cases. *Id.* at 19-20. They further emphasize the monetary and non-monetary value of the settlement to the class; the class and collective members' positive reaction to the settlement; the

1    challenges faces by counsel in prosecuting this action; the substantial hours devoted to prosecuting
2    the action; and the contingent risk assumed by counsel in representing the Plaintiffs. *Id.* at 14-17.
3    The Court agrees.

4    First, Plaintiffs contend that they have negotiated a "landmark" settlement in securing a
5    $11,625,000 common fund and programmatic relief. *Id.* at 18.  Beyond individual settlement
6    awards, Plaintiffs obtained programmatic relief to benefit class and collective members and other
7    similarly situated applicants who will apply with PwC in the future. *Id.* at 14.  In circumstances
8    where it is difficult to determine the monetary value of prospective relief, this Court has
9    considered whether a policy change provides a substantial and immediate benefit to the class to
10   help determine the reasonableness of a requested attorney's fee. *See, e.g., Bennett v.
11   SimplexGrinnell LP*, No. 11-cv-01854-JST, 2015 WL 12932332, at *6 (N.D. Cal. Sept. 3, 2015)
12   (explaining current and future payments of prevailing wages to workers is more tangible than the
13   prospective relief in many other settlements).  Here, as Plaintiffs suggest, the two-year
14   programmatic relief program has the potential to result in more older applicants applying and
15   being hired to Covered Positions at PwC as a result of the expanded recruitment efforts and
16   increased diversity training.  ECF No. 326 at 16.

17   Second, this case has been hard fought by Plaintiffs on a contingency basis over four years
18   of litigation.  As discussed above, the Parties have engaged in substantial motion practice,
19   including PwC's movement for judgment on the pleadings, PwC's motion for interlocutory
20   appeal, and Plaintiffs' motions for collective action certification. *Id.* at 12-13.  This Court has
21   previously explained that contingency litigation is "the nature of the beast" and "not a special
22   consideration." *Hawthorne v. Umpqua Bank*, No. 11-cv-06700-JST, 2015 WL 1927342, at *5
23   (N.D. Cal. Apr. 28, 2015) (internal quotation marks omitted).  Nevertheless, the attorney's fee
24   award should take into account the risk of representing Plaintiffs on a contingency basis over a
25   period of four years of litigation. *See Willner v. Manpower Inc.*, No. 11-cv-02846-JST, 2015 WL
26   3863625, at *6 (N.D. Cal. June 22, 2015).  Plaintiffs assert correctly that the four-year litigation
27   was "extremely hard fought," ECF No. 326 at 12, and in the Court's experience, unusually so.
28   Each of these factors supports an upward adjustment from the 25% benchmark.

13

Although a 35% fee award is on the higher end of the range of approved awards in this circuit, other courts have approved comparable awards in the appropriate circumstances. *See Chavez v. Netflix Inc.*, 162 Cal. App. 4th 43, 66 n.11 (2008) (observing that fee awards in class actions average around one-third of the recovery); *Bennett*, 2015 WL 12932332, at *6 (awarding class counsel 38.8% of common fund with a 0.60x multiplier, representing approximately 7,000 hours of work, and resulted in tangible prospective relief as a result of ongoing compliance with prevailing wage requirements); *see also Rivas v. BG Retail, LLC*, No. 16-cv-06458-BLF, 2020 WL 264401, at *8 (N.D. Cal. Jan. 16, 2020) (*citing Miller v. CEVA Logistics USA, Inc.*, No. 2:13-cv-01321-TLN, 2015 WL 4730176, at *8 (E.D. Cal. Aug. 10, 2015) ("California district courts usually award attorneys' fees in the range of 30-40% in wage and hour class actions that result in the recovery of a common fund under $10 million."); *Alvarez v. Farmers Ins. Exch.*, No. 3:14-cv-00574-WHO, 2017 WL 2214585, at *3 (N.D. Cal. Jan. 18, 2017) ("Fee award percentages generally are higher in cases where the common fund is below $10 million.").

Finally, the Court cross-checks against the lodestar amount, which here represents an exceptionally high number of hours spent on this case. A pure lodestar award would account for 57% of the common fund. Reasonably, Plaintiffs have not sought an award of the entirety of their $6,629,940 lodestar fees. *See In re Bluetooth*, 654 F.3d at 944 (noting that the formulaic calculation of attorney's fees may result in an unreasonable award and encouraging district courts to cross-check awards using a second method). Instead, Plaintiffs request a negative 0.6x multiplier, which supports the request for a greater-than-average common fund percentage award. *See Vizcaino*, 290 F.3d at 1051 n.6 (a majority of class action settlements approved had fee multipliers that ranged between 1.5 and 3). The requested attorney's fee award represents 61% of Plaintiffs' $6,629,940 lodestar amount, which they explain as representing a total of 14,156 hours spent on the case as of the date of Plaintiffs' motion.[4] *See* ECF No. 326. at 16; Declaration of

---

[4] The lodestar calculation does not include hours expended since the filing of the fee motion, which Plaintiffs contend will increase as they continue to assist class and collective members with questions about the Settlement, move for final approval, oversee payment of awards to class and collective members, respond to questions about Settlement implementation, participate in the two-year programmatic relief component of the Settlement and distribution of the reserve fund, and ensure compliance with the programmatic relief terms. ECF No. 326 at 16.

14

Jahan C. Sagafi in Support of Motion ("Sagafi Decl."), ECF No. 237 at 18; ECF No. 327-3, Ex. 3; Declaration of Daniel B. Kohrman in Support of Motion ("Kohrman Decl."), ECF No. 328 at 9; ECF No. 328-1, Ex. 1.  This Court has previously found that an award exceeding 25% is reasonable where the total fee award is lower than the lodestar calculation.  *See Bennett*, 2015 WL 12932332, at *6 (explaining that the Ninth Circuit encourages courts to cross-check award, rather than rely on formulaic calculations that may result in an unreasonable award); *see also Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990) ("The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors.").  Here, the requested award would not "yield windfall profits for class counsel in light of the hours spent on the case." *See In re Bluetooth*, 654 F.3d at 942.

For these reasons, the Court awards attorney's fees in the amount of $4,068,750.

**B.   Costs**

An attorney may "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (citation omitted).  To support an expense award, plaintiffs should file an itemized list of their expenses by category and the total amount advanced for each category, allowing the court to assess whether the expenses are reasonable.  *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826, at *30 (N.D. Cal. Apr. 1, 2011), *supplemented*, 2011 WL 1838562 (N.D. Cal. May 13, 2011).

Plaintiffs incurred $270,323.63 in costs.  ECF No. 334 at 15, n7.  The Court has reviewed Plaintiffs' expenses and finds them reasonable.  Therefore, the Court grants the request for reimbursement of costs.

**C.   Service Awards**

**1.   Legal Standard**

"[Incentive] awards are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, [and] to make up for financial or reputation

15

risk undertaken by bringing the action . . . ." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). The Ninth Circuit has established that named plaintiffs in a class action are eligible for reasonable incentive awards. *Wren*, 2011 WL 1230826, at *31. The Court should consider:

> (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; (3) the duration of the litigation and the amount of time and effort the plaintiff expended in purs[uing] it; and (4) the risks to the plaintiff in commencing the litigation, including reasonable fears of workplace retaliation, personal difficulties, and financial risks.

*Id.* at *32 (citations omitted). Indeed, "courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

### 2. Discussion

#### a. Named Plaintiff Awards

The two named plaintiffs each request an incentive award of $20,000. ECF No. 326 at 12. No class or collective members have objected to these awards. *Id.* at 33. A $20,000 award exceeds the typical incentive award in the Ninth Circuit, where $5,000 is presumptively reasonable. *See Harris v. Vector Mktg. Corp.*, No. 08-cv-5198-EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) ("Several courts in this District have indicated that incentive payments of $10,000 or $25,000 are quite high and/or that, as a general matter, $5,000 is a reasonable amount."). To determine the reasonableness of a requested incentive award, an important consideration is the proportionality between the incentive award and the range of class members' settlement awards. *Burden v. SelectQuote Ins. Servs.*, No. 10-cv-5966-LB, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013). Here, the 3,329 class members with valid claim forms will receive settlement payments of, on average, $2,054, and the highest individual payment will be approximately $6,054. ECF No. 334 at 16. In other words, the requested incentive award for the named plaintiffs will exceed the average and the highest individual payments. *See Wren*, 2011 WL 1230826, at *36-37 (approving $5,000 awards to each of 24 class representatives, noting that although a majority of class members received less than $5,000, many received more than $5,000).

However, Courts will grant an award that exceeds $5,000 when warranted. *See Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 335 (N.D. Cal. 2014) (awarding two $10,000 service awards where defendant would pay separately rather than pulling from common fund). First, the aggregate proposed incentive award for the two named plaintiffs is 0.34% of the Gross Fund. Second, Plaintiffs assert that $20,000 is appropriate because of each named plaintiffs' significant contributions, including spending hundreds of hours fulfilling their roles, undertaking this litigation at considerable personal and professional risk, and because each will also sign a general release that is broader than the release applicable to other class members. ECF No. 326 at 30-32; *see also* Declaration of Steve Rabin, ECF No. 330 at 3 (spending approximately 490 hours); Declaration of John Chapman, ECF No. 331 at 3 (spending approximately 300 hours). For example, Rabin spent approximately 490 hours fulfilling his role as named plaintiff, which included identifying potential witnesses, supporting the research into applicable case theories, explaining PwC's hiring policies and procedures to counsel, providing feedback and insight on case strategy, reviewing and providing responses to case filings, searching for and producing documents in response to discovery requests, providing responses to interrogatories, working with Plaintiffs' counsel to draft declarations in support of conditional certification, thinking through changes to PwC's policies, reviewing the settlement agreement and talking to Plaintiffs' counsel about the settlement. ECF No. 330 at 3-4. Furthermore, Rabin, who works in the accounting industry, believes his participation in this litigation has caused him professional harm because his income from teaching other CPAs "has evaporated to nearly zero" and corporate engagements have decreased. *Id.* at 4

The significant number of hours named plaintiffs spent supporting litigation efforts, the substance of their contributions, and the personal and professional risk taken supports the requested $20,000 service award to each named plaintiff. *See Vedachalam v. Tata Consultancy Servs., Ltd*, No. 06-cv-0963-CW, 2013 WL 3929129, at *1-2 (N.D. Cal. July 18, 2013) ($35,000 and $25,000 to named plaintiffs who spent approximately 624 and 451 hours and traveled for depositions); *Walton v. AT&T Servs., Inc.*, No. 15-cv-03653, ECF No. 209 at 12 (N.D. Cal. Feb. 2, 2018) ($20,000 to two class representatives and $5,000 to seven testifying witnesses who

17

participated in depositions).

### b. Declarant Awards

Plaintiffs also propose a $2,000 Service Award for each of the 24 declarants[5] who have agreed to sign a general release. ECF No. 334 at 15. According to Plaintiffs, service awards for these declarants are reasonable because they will sign a general release and because they have exposed themselves to potential retaliation from future employers due to their association with the case. ECF No. 327 at 17. However, because Plaintiffs have not elaborated on declarants' contributions to the plaintiffs or the amount of time declarants have spent on litigation, the Court finds that a $2,000 service award for declarants is not reasonable. *See Vedachalam*, 2013 WL 3929129, at *2 (awarding $1,000 to each testifying declarant).

The Court concludes that Service Awards of $20,000 to the named plaintiffs are reasonable, given the effort expended by each named plaintiff and the potential for future adverse consequences to their employment. Because declarants have opened themselves up to some reputational risk and because each declarant will sign a general release, the Court concludes that $1,000 is a reasonable service award for the 24 declarants.

## CONCLUSION

For the foregoing reasons, the Court hereby orders as follows:

1. For the reasons set forth in its August 19, 2020 order, ECF No. 316, the Court confirms its certification of the class for settlement purposes only.

2. The Court grants final approval of the proposed settlement agreement.

3. The Court awards Plaintiffs' Counsel $4,068,750.00 in attorney's fees.

4. The Court awards Plaintiffs' Counsel $270,323.63 in costs.

5. The Court awards named plaintiffs Steve Rabin and John Chapman each a service award of $20,000.00, and awards each of the 24 declarants a service award of $1,000.00.

7. The Court grants the request for settlement administration costs up to $140,501.00.

---

[5] Although the Settlement Agreement referenced 28 Declarants, *see* ECF No. 312-2 § 1.14, Plaintiffs explain that 4 Declarants did not fit the settlement class or collective definitions and were therefore excluded from the Settlement. ECF No. 334 at 15 n.6.

8. The Court grants the request for Implementation Expert costs up to $20,000.00.

9. The individuals who requested to opt-out of the Settlement are excluded from the class.

10. The Court retains continuing jurisdiction over this settlement solely for the purposes of enforcing the agreement, addressing settlement administration matters, and addressing such post-judgment matters as may be appropriate under the Court rules and applicable law.

**IT IS SO ORDERED.**

Dated: February 3, 2021



JON S. TIGAR
United States District Judge

19